FILED 05 MAR '12 12:56 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL ERIC HEDLUND,                    Civil No. 11-6281-AA
                                         OPINION AND ORDER
            Plaintiff,

      v.

THE EDUCATIONAL RESOURCES
INSTITUTE, INC. and PENNSYLVANIA
HIGHER EDUCATION ASSISTANCE
AGENCY,

            Defendants.
_____

Keith Y. Boyd
The Law Offices of Keith Y. Boyd
724 S Central Avenue, Suite 106
Medford, Oregon 97501

Natalie C. Scott
The Scott Law Group
497 Oakway Road, Suite 245
Eugene, Oregon 97401
      Attorneys for plaintiff/appellee

Sanford R. Landress
Greene & Markley, P.C.
1515 SW Fifth Avenue, Suite 600
Portland, Oregon 97201
      Attorney for defendant/appellant
      Pennsylvania Higher Education
      Assistance Agency

PAGE 1 - OPINION AND ORDER

Nancy K. Cary
Hershner Hunter, LLP
180 East 11th Avenue
P.O. Box 1475
Eugene, Oregon 97440
     Attorney for defendant
     The Educational Resources
     Institute, Inc.

AIKEN, Chief Judge:

Defendant Pennsylvania Higher Education Assistance Agency
("PHEAA") appeals from the decision of the bankruptcy court, which
partially discharged government-insured student loans held by
plaintiff-appellee Michael Hedlund ("Hedlund"). The bankruptcy
court held that full repayment of the loans would cause Hedlund an
"undue hardship" within the meaning of 11 U.S.C. § 523(a)(8). It
therefore discharged all amounts that Hedlund owed to PHEAA in
excess of $32,080. For the reasons set forth below, the bankruptcy
court's decision is reversed.

**BACKGROUND**[1]

Hedlund obtained a bachelor of science degree in business
administration from the University of Oregon in 1992 and a law
degree from Willamette University in 1997. Excerpt of Record
("ER") 86, 406. He financed law school by obtaining federal
Stafford student loans totaling $85,245.87. ER 34, 408. Interest
accrues on the loans at a rate of 4.22% per annum. ER 34.

Hedlund's father and brother are attorneys in Klamath Falls,

---

[1] On remand in 2010, the bankruptcy court gave the parties an
opportunity to reopen the record; both parties objected. ER 340-
343. As such, the facts are set forth as they existed on the
record at the time that Hedlund filed for bankruptcy in 2003 and,
accordingly, are relayed in the present tense.

Oregon, where Hedlund resides. ER 133, 138, 173. Hedlund obtained a position with the District Attorney's office in Klamath Falls after graduating from law school; he planned on staying at the District Attorney's office for a couple of years and then working at his father's firm. ER 143, 407. Hedlund, however, was unable to pass the bar exam, despite sitting for the test twice, once in 1997, and again in 1998. ER 143, 407. On the morning of the third scheduled bar exam in 1999, Hedlund locked his keys in the car and never made it to the test. ER 144, 407. He has no plans to retake the exam. ER 144.

Because he was unable to practice law, Hedlund filed for and received several extensions of his loan obligation. ER 409. His loans went into repayment status in January 1999; at that time, Hedlund submitted an application for loan consolidation. Id. While his application was being processed, Hedlund was instructed by PHEAA "not to worry if he got notices that his payments were late." Id. After receiving several such notices, Hedlund checked on the status of his application, only to be informed that his application had not been received; further, because he was not current on his payments, he could not re-apply for consolidation. Id. Hedlund chose not to apply for the William D. Ford Income Contingent Repayment Program ("ICRP"), believing he did not qualify for that program. ER 170, 193-94.

In 1999, Hedlund obtained a job as a juvenile counselor at the Klamath County Juvenile Department. ER 133, 407. Despite attaining full-time employment, Hedlund did not make the requisite

$800 per month payments to PHEAA. ER 310, 410. In fact, he made only one payment on his debt prior to filing for bankruptcy: in September 1999, Hedlund advanced $954.72 to PHEAA using the proceeds of a $5000 inheritance. ER 34, 191, 410. Subsequently, Hedlund made a one-time payment offer to PHEAA of $5000, in exchange for more favorable loan terms and waiver of certain assessed fees; PHEAA declined this offer. ER 410.

In 2000, Hedlund got married. ER 408. In 2001, Hedlund and his wife had their first child. Id. Hedlund's spouse works at a flower shop, one day per week for six hours, earning $8.50 per hour. ER 88, 309, 408. Mrs. Hedlund has the potential to work more but chooses not to because she prefers to stay at home with their daughter. ER 153, 309, 408.

In January 2002, after over two years of nonpayment, PHEAA administratively garnished Hedlund's wages at $258 per month, ultimately collecting $4,272.52. ER 34, 191, 410. In the spring of 2003, a second student loan creditor garnished more than $1000 from Hedlund's bank account. ER 410.

Unable to simultaneously manage both garnishments, on May 7, 2003, Hedlund filed a petition for relief under Chapter 7 of the Bankruptcy Code. ER 48-49, 410. On June 16, 2003, Hedlund filed an adversary proceeding against PHEAA and the Educational Resources Institute, Inc.[2], seeking discharge of his student loan obligations

---

[2] The Educational Resources Institute, Inc. settled with Hedlund prior to trial in 2003; accordingly, they are not a party to this appeal.

PAGE 4 - OPINION AND ORDER

pursuant to 11 U.S.C. § 523(a)(8). ER 1-3, 48-49. At that time, Hedlund was thirty-three years old, married, with one dependent child; he was healthy, had no physical or mental disabilities, and had no drug or alcohol addictions. ER 172. His annual income was $40,320. ER 71, 309, 413.

Prior to trial, PHEAA offered Hedlund his choice of three different repayment plans, all designed to reduce his monthly payments. ER 34, 42, 191-92, 411. Each reamortization offer was over a thirty year term, with monthly payments varying between $307 and $446 per month[3]. ER 42, 311. Hedlund rejected these offers. ER 34, 191-92, 411.

Applying Brunner[4], the bankruptcy court partially discharged Hedlund's debt to the extent it exceeded $30,000. ER 8-19. PHEAA appealed to the Bankruptcy Appeals Panel ("BAP"), which reversed the bankruptcy court's decision and found Hedlund able to repay his debt. ER 29-32, 307-25.

Hedlund then appealed to the Ninth Circuit, which vacated the BAP's judgment and remanded the case to the bankruptcy court "to reconsider all of the evidence in light of the Brunner test, and to make more complete findings on each of the three factors under the Brunner test so as to facilitate appellate review of whether

---

[3] Option 1: $417.67 per month for 359 months plus one payment of $414.79; option 2: $307.43 per month for 24 months, $432.56 per month for 335 months, and one payment of $430.88; option 3: $307.43 per month for 24 months, $374.11 per month for 36 months, $446.11 for 299 months, and one payment of $444.31.

[4] Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner), 831 F.2d 395, 396 (2d Cir. 1987).

PAGE 5 — OPINION AND ORDER

Hedlund has met the 'undue hardship' requirement of § 523(a)(8)."
ER 327. On October 20, 2010, the parties reargued this case before
Bankruptcy Judge Radcliffe, who also presided over the initial
trial. ER 329-55. Judge Radcliffe passed away before issuing his
findings; accordingly, the case was then reassigned to Judge
Brandt[5]. ER 356-396.

Bankruptcy Judge Brandt issued his ruling on May 19, 2011; his
opinion was virtually identical to Judge Radcliffe's, except that,
consistent with the Ninth Circuit's remand order, Judge Brandt made
additional findings. ER 400-34. As such, Judge Brandt held that
Hedlund met all three of the Brunner elements and therefore was
entitled to discharge approximately $55,000 of his indebtedness to
PHEAA. ER 397, 445-46. PHEAA now appeals the bankruptcy court's
decision. ER 442-447. The appeal initially proceeded before the
BAP, but Hedlund filed a timely election to have it proceed before
this Court. ER 447.

**STANDARD OF REVIEW**

On appeal from the Bankruptcy Court, the U.S. District Court
independently reviews findings of fact for clear error, while
conclusions of law are reviewed de novo. Schwarzkopf v. Briones
(In re Schwarzkopf), 626 F.3d 1032, 1035 (9th Cir. 2010). Mixed
questions of law and fact, such as the proper application of the
legal standard in determining whether a student loan is
dischargeable, are also reviewed de novo. Educ. Credit Mgmt. Corp.

---

[5] Judge Brandt is in recall status for the United States
Bankruptcy Court in the Western District of Washington.

v. DeGroot, 339 B.R. 201, 214-15 (Bankr.D.Or. 2006) (citing Rifino v. United States (In re Rifino), 245 F.3d 1083, 1087 (9th Cir. 2001)).

## DISCUSSION

PHEAA argues on appeal that the bankruptcy court erred in ruling that a healthy thirty-three year old making $40,320 per year, married with one child, with an undergraduate degree in business administration and a juris doctorate, with no physical or mental disabilities, and with the potential to increase his household income and to decrease his expenses, is entitled to discharge approximately $55,000 of his student loans as an undue hardship under 11 U.S.C. § 523(a)(8).

I.   Student Debt Overview

Before reaching the substantive merits of PHEAA's appeal, I will address a preliminary matter of great importance to today's student-debtors.   Students with advanced degrees, specifically juris doctorates, are facing a quagmire.   The law school milieu has changed drastically in the past two decades; universities admit more students, education costs continue to increase, and post-graduate positions remain scarce.   As such, it would be remiss for this Court to address Hedlund's attempt to discharge his law school debt without first putting these changes into context.   The Court, however, is mindful of the fact that when Hedlund graduated in 1997, these issues were not yet implicated to the degree that they are today.

Attending law school was a guaranteed way to ensure financial

PAGE 7 - OPINION AND ORDER

stability. For current graduates, however, this is no longer true, due in large part to the high cost of law school tuition. Forbes magazine reports that, from 1989 to 2009, the average cost of college tuition increased by 71%; in the same amount of time, the cost of law school tuition increased 317%. In addition, law school tuition has risen at twice the rate of inflation and at four times the rate of wage growth. Accordingly, with the exception of the independently wealthy, students must take out loans in order to finance their degrees.

While the exact amount of debt that a student must incur in order to obtain a law degree depends on a number of factors, the current national estimate is $100,000. Despite the relatively low cost of living, Oregon's students face a similar amount of debt upon graduation. Based on U.S. News and World Report's 2010 census, the average Lewis and Clark law student graduated with $105,928 in debt, the average University of Oregon law student graduated with $91,353 in debt, and the average Willamette University law student graduated with $91,347 in debt.

While the cost of law school is, alone, problematic, making matters worse is the post-graduate job market; the probability of employment upon graduation, especially at a reasonably well-paying job, is low. Despite reports that the economy is improving, the number of entry-level associate positions continues to shrink. By 2009, law students, even from top-tier law schools, were competing for half as many openings as the year before. As a result, the New York Times deemed 2009 "the most wrenching job search season in

over 50 years."

Job prospects are not likely to improve in the immediate future.   In fact, for the class of 2011, there are even fewer employment opportunities, as those graduates must compete against unemployed graduates from previous years for the same limited number of entry-level positions.  For example, in 2010, there were 382,828 applicants for clerkship positions with 874 federal judges, each of whom hires one to three clerks per year.   The New York Times attributed the overwhelming abundance of candidates to the fact that "more graduates [from previous years] are also competing for (and getting) these positions."   The most recent statistics indicate that, through the year 2018, there will only be 25,000 openings for the law schools' 45,000 new graduates each year.

Further, salaries continue to drop.  The National Association for Law Placement reported in its 2010 Associate Salary Survey that, in the private sector, annual compensation again declined for first year associates; the "overall median first-year salary was $115,000, and ranged from $72,000 in firms of 2-25 lawyers to $117,500 in firms of 501-700 lawyers, and $160,000 in firms of more than 700 lawyers."  In the public sector, starting salaries were drastically less, beginning at around $45,000.

While seemingly high, the overall national median is in no way representative of Oregon, due in part to the fact that the majority of Oregon firms are small to mid-sized, with less than twenty-five attorneys.   However, even Oregon's largest firms compensate their new hires at a much lower rate; first year associates at firms such

PAGE 9 - OPINION AND ORDER

as Lane Powell or Tonkon Torp are typically offered between $80,000 and $95,000 per year.

Accordingly, new Oregon attorneys should expect to be paid substantially less than the salaries reported in the 2010 Associate Salary Survey. In 2010, the median private sector starting salary was $58,571 for Willamette University College of Law graduates, $62,562 for University of Oregon School of Law graduates, and $83,000 for Lewis and Clark Law School graduates. Oregon's 2010 median public sector starting salary, however, was consistent with the national average.

As such, because Oregon law school graduates cannot expect six-figures, even those lucky enough to secure salaried positions still face an unmanageable amount of debt. The prospects of repaying these loans are far bleaker for those that do not find immediate employment, as these students remain responsible for making staggering monthly repayments[6]. As a result, many are forced to consolidate their loans or reorganize pursuant to the ICRP or a similar income-based repayment plan. While lowering monthly payments, these plans extend the loan term to twenty-five years, at the end of which any reaming balance is discharged. Any amounts discharged at the end of the loan term, however, may result in tax liability. Regardless, this is the best option for a number of students to repay their loans, and the best chance lenders and the government have of being repaid.

---

[6] Assuming $100,000 of debt at an interest rate of 7%, graduates are liable for payments of around $1200 per month.

Nevertheless, the foregoing discussion reveals that the current higher education system has become untenable and unsustainable; as a result, increasing numbers of students will be forced to file for bankruptcy. As such, the student loan issue is one that extends beyond the outcome of this decision and will continue unabated until it is addressed at a systemic level. Bearing this in mind, the Court now turns to the issue of whether Hedlund's student loans are dischargeable[7].

---

[7] Section I is based on the following sources: U.S. News & World Report, Willamette Law School Overview, http://grad-schools.usnews.rankingsandreviews.com/best-graduate-schools/top-law-schools/willamette-university-collins-03136; U.S. News & World Report, University of Oregon Law School Overview, http://grad-schools.usnews.rankingsandreviews.com/best-graduate-schools/top-law-schools/university-of-oregon-03135; U.S. News & World Report, Lewis and Clark Law School Overview, http://grad-schools.usnews.rankingsandreviews.com/best-graduate-schools/top-law-schools/lewis--clark-college-northwestern-03134; U.S. News & World Report, Best Grad Debt Programs, http://grad-schools.usnews.rankingsandreviews.com/best-graduate-schools/top-law-schools/grad-debt-rankings; National Association for Law Placement, 2010 Associate Salary Survey, http://www.nalp.org/uploads/PressReleases/2010NALPSalPressRelease.pdf; Gerry Shih, Downturn Dims Prospects Even At Top Law Schools, N.Y. Times, August 25, 2009, available at http://www.nytimes.com/2009/08/26/business/26lawyers.html?pagewanted=1&ref=lawschools; David Segal, Law School Economics: Ka-Ching!, N.Y. Times, July 16, 2011, available at http://www.nytimes.com/2011/07/17/business/law-school-economics-job-market-weakens-tuition-rises.html?pagewanted=1&_r=1&sq=law%20school%20economics&st=cse&scp=2; Kathy Kristof, The Great College Hoax, Forbes Magazine, February 2, 2009, available at http://www.forbes.com/forbes/2009/0202/060.html; Catherine Rampell, Judges Compete For Law Clerks on a Lawless Terrain, N.Y. Times, September 23, 2011, available at http://www.nytimes.com/2011/09/24/business/judges-compete-for-law-clerks-on-a-lawless-terrain.html?pagewanted=1&_r=1&ref=lawschools; Martindale-Hubbell, Portland Law Firm Listings, http://www.martindale.com/corporate-law/s-oregon/Portland-law-firms.htm; Find Law, Firm Salaries & Other Statistics, http://www.infirmation.com/shared/insider/payscale.tcl?state=OR; Elie Mystal, The Student-Loan Racket: Now in One Easy-to-Understand Graphic, Above the Law (Sept. 3, 2010),

II.   Analysis

Student loan debt obligations are presumptively nondischargeable in bankruptcy absent a showing of "undue hardship" derived through an adversary proceeding.   See 11 U.S.C. § 523(a)(8).   To determine whether excepting student debt from discharge will impose an undue hardship, the Ninth Circuit applies the three-part test first enunciated in Brunner.   See Pena v. United Student Aid Funds, Inc. (In re Pena), 155 F.3d 1108, 1111-12 (9th Cir. 1998) (adopting the Brunner test).

Under Brunner, the debtor must prove that: 1) he cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if required to repay the loans; 2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and 3) the debtor has made good faith efforts to repay the loans. Id. at 1111; Brunner, 831 F.2d at 396.   "[T]he burden of proving undue hardship is on the debtor, and the debtor must prove all three elements before discharge can be granted." Rifino, 245 F.3d at 1087-88 (citation omitted).

If, however, the debtor can establish all three prongs, the court may exercise its equitable authority to partially discharge that portion of the student loan that the debtor could not repay without imposing an undue hardship.   Saxman v. Educ. Credit Mgmt.

http://abovethelaw.com/2010/09/the-student-loan-racket-now-in-one -easy-to-understand-graphic/; Stanley Fish, The Bad News Law Schools, N.Y. Times, Feb. 20, 2012, available at http://opinionator.blogs.nytimes.com/2012/02/20/the-bad-news-law-schools/.

Corp. (In re Saxman), 325 F.3d 1168, 1174-75 (9th Cir. 2003).

### A.   Minimal Standard of Living

The first prong of the Brunner test requires Hedlund to establish that he could not maintain, based on his current income and expenses, a minimal standard of living if he were required to repay PHEAA. Id. at 1173; see also Rifino, 245 F.3d at 1088. More than "simply tight finances" and "temporary financial adversity" must be demonstrated; however, a showing of "utter hopelessness" is not required. Rifino, 245 F.3d at 1088.

Rather, determining what constitutes a minimal standard of living for each individual debtor requires a case-by-case assessment; "the test is whether it would be 'unconscionable to require the debtor to take steps to earn more income or reduce [his] expenses' in order to make payments under a given repayment schedule." Carnduff v. U.S. Dep't of Educ. (In re Carnduff), 367 B.R. 120, 127 (9th Cir. BAP 2007) (quoting Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane), 287 B.R. 490, 495 (9th Cir. BAP 2002); and United Student Aid Funds, Inc. v. Nascimento (In re Nascimento), 241 B.R. 440, 445 (9th Cir. BAP 1999)).

In analyzing the first element, the bankruptcy court determined that Hedlund "had maximized his income"[8] and that it

___

[8] The Court agrees with Hedlund that a debtor is not ordinarily required to prove maximization of income as part of the first Brunner prong. Educ. Credit Mgmt. Corp. v. Mason (In

PAGE 13 - OPINION AND ORDER

would be "unconscionable" to require him to work more than forty hours per week. ER 413, 415. Nevertheless, the bankruptcy court resolved that "it would be reasonable and not unconscionable to require Ms. Hedlund to work three days rather than one day per week, particularly in light of the availability of free child care from grandparents." ER 416. The court also found that Hedlund could reduce his monthly expenses by slightly abating his recreation, clothing, and child care budgets. ER 417-19.

After factoring in these income and cost adjustments, the court concluded that Hedlund had a monthly surplus of $465, which is insufficient to make the requisite monthly loan payments. ER 419. Accordingly, the bankruptcy court held that Hedlund fulfilled the first Brunner prong. Id.

On appeal, PHEAA contends that the court incorrectly applied the legal standard under this prong of Brunner because Hedlund failed to minimize his expenses. Specifically, PHEAA contends that the bankruptcy court erred by rejecting the BAP's analysis, which held that Hedlund's cable, internet, cell phones, gym membership, and new car payments were all luxury items that "warrant adjustment, as a debtor who would show 'undue hardship' must 'adjust [his] lifestyle to allow [him] to make payment on [his]

re Mason), 464 F.3d 878, 882 n.3 (9th Cir. 2006). Because the Ninth Circuit expressly directed the bankruptcy court to assess whether, in regard to the first element, "Hedlund could increase his income by taking on a part-time job or [by] his wife working part time," this Court finds that it was not improper for Judge Brandt to make such findings on remand. ER 327. Further, if making such a determination was error, it was harmless, since the bankruptcy court found that Hedlund met his burden in regard to the first Brunner prong.

student loan." ER 315 (quoting <u>Nascimento</u>, 241 B.R. at 446). By reducing or eliminating some of these non-essential costs, PHEAA asserts that Hedlund could add approximately $600 per month to his available funds, which, combined with the additional income generated by his wife, yields more than enough to make full payments on the student debt. ER 316.

Even though PHEAA contends that it is challenging the bankruptcy court's application of the proper legal standard, the calculation of cost reductions is factual in nature and, as such, "'is a matter properly left to the discretion of the bankruptcy court.'" <u>Mason</u>, 464 F.3d at 882 (quoting <u>Pena</u>, 155 F.3d at 1112). Accordingly, this Court cannot disturb those findings unless clearly erroneous. <u>See, e.g.,</u> <u>Biranne</u>, 287 B.R. at 496.

A finding is clearly erroneous when, although there is evidence to support it, the reviewing court "is left with the definite and firm conviction that a mistake has been committed"; regardless, this standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 573 (1985) (citations and internal quotations omitted). Rather, if the lower court's "account of the evidence is plausible in light of the record viewed in its entirety," the reviewing court may not reverse. <u>Id.</u> at 574.

If permitted to revisit this element anew, this Court would agree with the BAP's analysis and further decrease Hedlund's

PAGE 15 - OPINION AND ORDER

expenses by eliminating items which it construes as immoderate. For example, Hedlund expends $150 per month on transportation, even though he, his spouse, and extended family live in Klamath Falls and he resides slightly over a mile from his place of work.    ER 366.    As such, this cost is excessive in light of the circumstances.    In addition, this Court, like the BAP, observes that leasing a new car, especially when Hedlund owns outright a functioning 1990 Chevy Blazer, is not a necessary expenditure. Further, Hedlund's fixed-line telephone is superfluous given that both he and his wife have cell phones.    ER 72.

Regardless, this determination falls within the bankruptcy court's sole discretion.    Here, the court found that, because the car that Hedlund owned outright was "not sufficiently reliable for out of town trips, . . . I don't think that one could reasonably require a family not to have one non-luxury vehicle for reliable transportation."    ER 417-18.    As such, the court considered the new car, which costs $354 per month, as reasonably necessary to maintain a minimal standard of living.    ER 418.    This is a plausible interpretation of the evidence.    However, there were no specific findings on the record regarding the other disputed expenses.    Nevertheless, at trial and the rehearings, Hedlund presented evidence regarding the amounts of various expenditures; presumably the bankruptcy court heard and considered this evidence when making its finding regarding the first prong of the Brunner test.

In addition, the Ninth Circuit has declined to find clear

PAGE 16 - OPINION AND ORDER

error where the bankruptcy court determined that a debtor's standard of living would fall below a minimal level if required to repay her student loans, even though her budget included cable television, a new car, and private schooling for her child. See, e.g., Rifino, 245 F.3d at 1088. As such, "a bankruptcy court's refusal to decline a discharge because of these expenses, may not be 'necessarily clearly erroneous.'" Biranne, 287 B.R. at 496 (citations omitted). Therefore, based on the record, this Court cannot find that the bankruptcy court committed clear error when applying the first prong of the Brunner test.

B.   Additional Circumstances

The second prong of the Brunner test requires Hedlund to prove that "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." Brunner, 831 F.2d at 396. The Ninth Circuit recently clarified that a "debtor does not have a separate burden to prove 'additional circumstances,' beyond the inability to pay presently or in the future." Educ. Credit Mgmt. Corp. v. Nys (In re Nys), 446 F.3d 938, 945 (9th Cir. 2006). Rather, the court must "presume that the debtor's income will increase to a point where [he] can make payments and maintain a minimal standard of living; however, the debtor may rebut that presumption" by introducing evidence "indicating that [his] income cannot reasonably be expected to increase and that [his] inability to make payments will likely persist." Id. at 946.

In order to determine whether additional circumstances are

PAGE 17 - OPINION AND ORDER

present, the bankruptcy court "may look to [the following] unexhaustive list" of factors:

> 1) serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; 2) the debtor's obligations to care for dependents; 3) lack of, or severely limited education; 4) poor quality of education; 5) lack of usable or marketable job skills; 6) underemployment; 7) maximized income potential in the chosen educational field, and no other more lucrative job skills; 8) limited number of years remaining in [the debtor's] work life to allow payment of the loan; 9) age or other factors that prevent retraining or relocation as a means for payment of the loan; 10) lack of assets, whether or not exempt, which could be used to pay the loan; 11) potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income; 12) lack of better financial options elsewhere.

Id. at 947 (the "Nys factors").

In addressing the second prong, the bankruptcy court analyzed the Nys factors and found that Hedlund's lack of usable or marketable job skills, namely his "lack of admission to the bar," his inability to substantially increase his income over the loan repayment term or to relocate, the absence of current assets, and likelihood that expenses will increase because he wants to have more children, were additional circumstances indicating that Hedlund's financial circumstances would not improve for a significant period of time. ER 421-24. Accordingly, the court held that Hedlund "rebutted the presumption that his income will increase or his expenses decrease to a point where he could make, without undue hardship, the full payment on the PHEAA debt." ER 424.

PHEAA argues that the bankruptcy court erred because under

PAGE 18 - OPINION AND ORDER

Ninth Circuit precedent, "young, well-educated debtors like Hedlund . . . are not entitled to give up so easily at the taxpayer's expense." Appellant's Opening Br. 10 (citing Mason, 464 F.3d at 885 and Biranne, 287 B.R. at 497). Rather, PHEAA contends that Hedlund failed to demonstrate "insurmountable barriers" indicating that his current financial state will persist, as he has the ability to retake the bar exam again or find additional part-time employment and is only thirty-three years old. Appellant's Opening Br. 9. As such, PHEAA contends that the bankruptcy court erroneously applied the legal standard under the second Brunner prong. Thus, the Court reviews this matter de novo. See, e.g., Biranne, 287 B.R. at 497.

Despite PHEAA's assertion to the contrary, the debtor is not required to establish "insurmountable barriers" in regard to the second prong; instead, he must merely establish an inability to "maintain a minimum standard of living now and in the future if forced to repay [the] student loans." Nys, 446 F.3d at 946. Here, Hedlund has met this burden. Accepting that Hedlund is currently unable to maintain a minimal standard of living and make full monthly loan repayments, there is nothing in the record which suggests that these circumstances will not persist indefinitely.

As the bankruptcy court noted, neither Hedlund nor his spouse own any significant assets. ER 408. Hedlund has maximized his income in his position with the county, which is relatively high-paying for the area. ER 423. Moreover, there are only three possible promotions in his department and "the earliest that one of

PAGE 19 - OPINION AND ORDER

those would be expected to be available was eight years out." Id.
Any salary increases gained by relocating would be offset by
increased costs of living, especially considering that Hedlund
rents a two-bedroom duplex from his parents below market rate. Id.
Finally, while it is possible that Hedlund could successfully
retake the bar exam and become a licensed attorney, there is no
guarantee that he could make more money as such, at least for a
significant portion of the repayment period while remaining in the
Klamath Falls area.

This Court agrees with PHEAA that Hedlund could increase his
monthly surplus by increasing his wife's work hours and decreasing
expenses; however, as discussed above, Hedlund remains unable to
make full monthly repayments even with these adjustments.  Thus,
Hedlund's youth, education, and good health do not change the fact
that, even working full-time at a well-paying position, he is
incapable of fully repaying his loans and will remain as such for
a significant portion of the repayment period.  Therefore, the
bankruptcy court did not err in regard to the second Brunner
element.

C.  Good Faith

The third and final prong of the Brunner test requires Hedlund
to affirmatively demonstrate a good faith effort to repay student
loans.  See Pena, 155 F.3d at 1114.  "'Good faith is measured by
the debtor's efforts to obtain employment, maximize income, and
minimize expenses.'"  Mason, 464 F.3d at 884 (quoting Birrane, 287
B.R. at 499).  Courts also consider "'[a] debtor's effort—or lack

PAGE 20 - OPINION AND ORDER

thereof-to negotiate a repayment plan,' although a history of making or not making payments is, by itself, not dispositive." Id. (quoting Birrane, 287 B.R. at 499-500). In any event, "[t]he debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control." Birrane, 287 B.R. at 500 (citation and internal quotation omitted).

Every court that has addressed this prong in this case found it to be the most troublesome, including the Ninth Circuit which stated that the BAP's ruling against Hedlund on the issue of good faith was "not without justification." ER 18, 319, 327. This Court agrees and reiterates Judge Radcliffe's assertion that Hedlund's case is "fairly close" in regard to the third Brunner element. ER 18.

In analyzing the third prong, the bankruptcy court concluded that Hedlund exhibited good faith because he: 1) maximized his income; 2) did not challenge administrative garnishments of $258 per month for sixteen months; 3) did not file for bankruptcy until four years after his loans became due; 4) attempted to negotiate for lower monthly payments; and 5) offered to make a one-time payment of $5000, which PHEAA refused. ER 425-26.

Further, the bankruptcy court found that Hedlund's refusal to participate in alternative repayment plans "was not dispositive on the issue of good faith," especially since "he did attempt to negotiate consolidation and lower payments, but was first stymied by a lost application." ER 427. In regard to PHEAA's three

PAGE 21 - OPINION AND ORDER

repayment plans, all of which are over a thirty year term, the court stated that "accepting any of those offers would have had [Hedlund] paying on his student loans into his mid 60's. His refusal to obligate himself long past when his child or children would hopefully have had a chance to go to college themselves does not seem to me to obviate good faith." ER 427-28. In regard to the ICRP, under which Hedlund's loan obligation would be paid over a twenty-five year term, the bankruptcy court found that this was not a "feasible" option because "the ICRP simply is going to substitute a nondischargeable tax debt based on loan forgiveness for the student loan debt." ER 428.

PHEAA challenges this finding on appeal, arguing that Hedlund has not shown good faith based on his failure to maximize his income by retaking the bar exam or obtaining additional work, his total lack of voluntary payments beyond a one-time payment of approximately $950 in 1999, and his blanket refusal to renegotiate his loans. Specifically, regarding the bankruptcy court's rejection of PHEAA's three consolidations offers and the ICRP, PHEAA asserts that the court's "rul[ing] that repayment plans must either provide for minimum payments, or only have a short term, or both, and have no possible future tax consequences . . . [is] a remarkable conclusion. No Ninth Circuit case so holds." Appellant's Reply Br. 6.

In other words, PHEAA does not dispute the factual findings, but rather contends that the bankruptcy court incorrectly applied the legal standard under the third Brunner prong when it determined

that Hedlund made a good faith effort to repay his student loans. In support of its argument, PHEAA cites to <u>Biranne</u> and <u>Mason</u>. <u>See</u> Appellant's Opening Br. 7-8; Appellant's Reply Br. 6-8. Accordingly, this Court reviews the bankruptcy court's conclusion <u>de novo</u>. <u>See, e.g.</u>, <u>Biranne</u>, 287 B.R. at 500-01.

               i.   <u>Obtaining Employment, Maximizing Income, and</u>

                   <u>Minimizing Expenses</u>

It is undisputed that Hedlund obtained full-time, steady employment and that he has maximized his earning potential for that position. Further, the record reveals that this is the highest paying position that he could obtain based on his skills and education; Hedlund applied for, but did not get, two higher paying jobs in the Klamath Falls area. ER 414. In addition, an uncontroverted occupational expert testified that, even though Hedlund was willing to relocate, there were no jobs in the region which would result in greater overall earnings once the increased costs of living were factored in. ER 414-15.

While the Court agrees with PHEAA that taking on a part-time job would increase Hedlund's monthly income, it refuses to engage in a line drawing exercise regarding how many hours of weekly labor are required to denote good faith. Thus, while there was no evidence that Hedlund explored the possibility of part-time work, his failure to obtain a second job does not necessarily indicate a lack of good faith, especially as Hedlund is also a father and, as such, has parenting responsibilities to tend to on his nights and weekends.

Hedlund, however, is capable of augmenting his monthly income through increasing his wife's work to more than six hours per week. This situation would impose no additional costs, since both sets of grandparents live nearby and are "excited and delighted" to provide free childcare.  ER 309, 416.  As such, by Mrs. Hedlund working only twelve additional hours per week, Hedlund's monthly surplus would increase by nearly $350.

In regard to the bar exam, PHEAA asserts that "failure to pass the bar exam is not a sufficient reason for the discharge of student loans."  Mason, 464 F.3d at 885.  While this Court agrees with PHEAA's contention as a general proposition, the failure to pass the bar exam is not necessarily indicative of a lack of good faith.  Unlike the debtor in Mason, Hedlund sat for and failed the bar exam more than one time; in fact, he failed it twice and registered and studied for it a third time.  The Court presumes that each of these attempts were genuine.  As such, Hedlund's lack of success with the bar exam does not evidence an absence of good faith.

Further, it is questionable whether Hedlund could make more as a licensed attorney.  The 2010 census reveals that Willamette University College of Law graduates had a starting salary of $58,571.  Those who work in the public sector, such as at the District Attorney's office or for the county, made $44,000.  Based on these statistics, and accounting for inflation, as well as the fact that attorneys in smaller markets are generally compensated at lower rates, it is unlikely that Hedlund would be making

PAGE 24 - OPINION AND ORDER

significantly more money as an attorney in Klamath Falls than as a juvenile counselor.  Accordingly, Hedlund's ability to maximize his income by taking the bar exam again is uncertain and, as such, his failure to do so is not determinative on the issue of good faith.

As discussed above, Hedlund has failed to fully minimize his expenses.  Therefore, while Hedlund has obtained steady employment, this Court finds that he has not used his best efforts to maximize his income or minimize his expenses.  The Court's inquiry, however, does not end there.

### ii.   Negotiation of a Repayment Plan and Voluntary Payments

Good faith is also measured by "'[a] debtor's effort-or lack thereof-to negotiate a repayment plan,' although a history of making or not making payments is, by itself, not dispositive." Mason, 464 F.3d at 884 (quoting Birrane, 287 B.R. at 499-500).

It is undisputed that, prior to filing for bankruptcy, Hedlund was not capable of making full monthly payments.  Further, there is some evidence that Hedlund made minimal efforts to negotiate repayment of his student debt.  Specifically, in January 1999, Hedlund submitted an application for loan consolidation with PHEAA, which was ultimately denied because he was not current on his payments.  In addition, Hedlund made a one-time payment offer to PHEAA of $5000.

Nevertheless, this Court finds Hedlund's lack of voluntary payments problematic.  While not dispositive, a debtor's payment history is a relevant consideration.  Id.  Here, Hedlund made one

PAGE 25 - OPINION AND ORDER

voluntary payment in over four years[9].    By his own admission, however, he was capable of making limited monthly contributions. ER 328.    Whether PHEAA would have accepted partial payments is unclear; however, there is no evidence that Hedlund even explored this option.    Such circumstances do not bear positively on Hedlund's good faith efforts.

What this Court finds even more vexatious, however, is Hedlund's lack of effort in attempting to negotiate a repayment plan.  Courts within this Circuit have found a lack of good faith based largely on a debtor's failure to apply for the ICRP or refusal to negotiate an alternative repayment plan.    See In re Chapelle, 328 B.R. 565, 573-74 (Bankr.C.D.Cal. 2005); DeGroot, 339 B.R. at 214-15.

Here, there is some ambiguity in the record regarding whether Hedlund is qualified for the ICRP.  ER 427.  Regardless, Hedlund did not apply, even though he was aware this option; further, there was no evidence that he had any discussions with PHEAA regarding the ICRP.  Thus, the Court finds that Hedlund's efforts to renegotiate his debt under the ICRP were less than diligent.

Moreover, the record does not establish that Hedlund took any additional steps to negotiate an alternative repayment plan directly with PHEAA.  While he did make a singular offer of $5000, the amount proposed represents less than six percent of the original loan amount and, therefore, it is no surprise that it was

---

[9] While not germane to these proceedings, it should be noted that, in the nearly nine years since filing for bankruptcy, Hedlund has not made a single payment to PHEAA.  ER 392.

PAGE 26 - OPINION AND ORDER

rejected, especially since Hedlund was also seeking more favorable loan terms and the waiver of assessed fees in exchange. The Court wonders why, after PHEAA declined his offer, Hedlund did not use these funds to go ahead and make over six months of regularly scheduled payments.

Further, Hedlund rejected PHEAA's three alternative repayment plans. A "debtor's obligation to make 'good faith' efforts to repay [his] education loans is not extinguished with the filing of an adversary proceeding in bankruptcy." Biranne, 287 B.R. at 500 (citation omitted). The repayment plans are between $49 to $188 more per month than PHEAA's administrative garnishment, which Hedlund admitted that he could afford, and all are less than the $465 per month surplus that Judge Brandt assessed in regard to the first Brunner element. ER 382. Even though PHEAA made its offer right before trial, it stipulated that these alternatives are still available. ER 34. There is no evidence that Hedlund had any discussions with PHEAA regarding these options at any point during these proceedings.

As such, the record reveals that Hedlund ceased any efforts to renegotiate a repayment schedule which would accommodate his means even though one was available. The fact that PHEAA's plans would require Hedlund "to obligate himself long past when his child or children would hopefully have had a chance to go to college" is irrelevant. ER 428. As discussed in section I, that the loan term must be extended, sometimes upwards of twenty-five to thirty years, in order to reduce monthly payments on a debt is a commonplace, if

PAGE 27 - OPINION AND ORDER

not unfortunate, economic reality shouldered by thousands of students in circumstances similar to or worse than Hedlund's.

In reviewing the third <u>Brunner</u> element <u>de novo</u> to determine whether Hedlund affirmatively and in good faith attempted to repay his loans, this Court analyzed a number of factors, including Hedlund's efforts to obtain employment, maximize income, minimize expenses, and to negotiate an alternative repayment plan, as well as his history of voluntary payments.

While this Court is dismayed by the circumstances faced by the majority of today's law school graduates, Hedlund's case is distinguishable. He graduated in 1997, which was a period of great prosperity and rapid economic growth for the United States. Thus, even without passing the bar exam, Hedlund was able to obtain relatively high-paying, steady employment. Further, Hedlund and his wife chose to be a single-income family, which is a lifestyle that few today can afford, especially when free child care is available. Therefore, Hedlund's financial circumstances are, in part, a by-product of his life choices rather than market forces.

More importantly, however, Hedlund has not met his burden of proof; the Court finds that the evidence he presented does not add up to an affirmative demonstration of good faith. Hedlund not only neglected to maximize his income, minimize his living expenses, and make voluntary payments, but he has also failed to take any steps toward renegotiating an alternative repayment plan. These factors are not beyond his reasonable control. As such, the bankruptcy court erred as a matter of law in finding that Hedlund met the

PAGE 28 - OPINION AND ORDER

third <u>Brunner</u> prong.

**CONCLUSION**

For the reasons set forth above, the bankruptcy court's order discharging Hedlund's student loan debt is REVERSED; Hedlund's full debt, in the amount of $85,245.87, is hereby REINSTATED. Accordingly, PHEAA's request for oral argument is DENIED as unnecessary.

PHEAA stipulates that its reorganization options remain available in the event that Hedlund's debt is nondischargeable; as such, the Court recommends that Hedlund reconsider these options in light of this opinion.

IT IS SO ORDERED.

Dated this 5th day of March 2012.


_____
Ann Aiken
United States District Judge